# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**QUOVADIS CONYICE EVANS,**

    Petitioner,

    v.                                                  Case No. 11-CV-690

**WILLIAM POLLARD,**

    Respondent.

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

Quovadis Conyice Evans ("Evans"), a Wisconsin prisoner, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Evans challenges his custody on sufficiency of the evidence grounds involving four of his nine convictions for false imprisonment. He argues that because the victims in those four counts did not testify, the State was unable to prove beyond a reasonable doubt that the victims did not consent to being restrained.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72(a) (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

This Court conducted a preliminary examination of the petition in accordance with Rule 4 of the Rules Governing § 2254 Cases. By order filed November 9, 2011, this Court determined that summary dismissal was not appropriate as "it does not plainly appear from 'the petition and any attached exhibits' that Evans is not entitled to relief" and ordered the respondent to answer the

petition. (Docket # 7.) The respondent answered and the parties subsequently briefed the petition. The matter is now ready for disposition and will be addressed below.

## BACKGROUND

The State of Wisconsin filed a criminal complaint on November 30, 2007 that charged Evans, along with two other actors, with seven counts of false imprisonment as a party to a crime contrary to Wis. Stat. §§ 940.30 and 939.05(2) and one count of second-degree sexual assault, contrary to Wis. Stat. § 940.225(2)(a). (Petitioner's Appellate Brief, Docket # 13-2 at 6.) A preliminary hearing was held on January 2, 2008 at which the judge found probable cause and Evans was bound over for trial. (*Id.* at 7.) Following the hearing, the State added two additional counts of false imprisonment and two counts of sexual assault to the charges. (*Id.*) In all, on April 14, 2008, Evans went to trial on nine counts of false imprisonment, two counts of sexual assault of a child, and one count of second degree sexual assault. Evans was found guilty of all nine counts of false imprisonment and was acquitted of the sexual assault charges. (*Id.* at 12; Verdict Transcript, 4/17/2008, Docket # 13-11 at 4-8.)

At trial, four victims of the false imprisonment counts did not testify: Nicholas B., Rashod H., Nathan B., and Nigel B. However, the other five did: Clea B., Kembelic G., Quaran S., Jaden S., and Milan S. Relevant to the false imprisonment counts, the trial testimony was as follows.

Around 3:00 p.m. on the day after Thanksgiving 2007, Clea B., then fourteen years old, was asleep in a downstairs room of her mother's house. (Jury Trial Transcript, 4/15/2008, Docket # 13-8 at 15-17.) Evans, a family friend, entered the room and left (*id.* at 18-19) and then Nicholas B., Clea's brother, and Rashod H., Clea's boyfriend, came into the room (*id.* at 20-21).

Evans then returned to the room along with two others, Joseph "Little Joe" Roschyk and Booker "Booker" Brown (*Id.* at 21; Ct. App. Decision, Docket # 13-4 at 3.) Evans threw a backpack

on the ground (Docket # 13-8 at 23); later, he took duct tape, hats, rope, and latex gloves from the backpack (*id.* at 30). Evans tried to talk to Clea B., asking her why she told her mother that they had sex. (*Id.* at 24-25, 33, 40-41.) Clea B. said that she ignored him and tried to go back to sleep. (*Id.* at 25-26.)

After Clea B. ignored Evans, Evans told Nicholas B. and Rashod H. to get on the floor and lay on their stomachs and ordered Little Joe to tie them up. (*Id.* at 26, 28.) Evans pulled two guns from his sweatshirt pocket and passed one to Booker; he held the other gun. (*Id.* at 27-28.) Evans then pointed a gun at Clea B. and then duct taped her hands "in the praying position." (*Id.* at 29.) Clea B.'s, Nicholas B.'s, and Rashod H.'s ankles were also bound with duct tape. (*Id.* at 30-32, 41.) After all three of them were bound at the wrists and ankles, Evans put Clea B., Nicholas B., and Rashod H. in a closet. (*Id.* at 32.) They used a knife to secure the closet doors. (Jury Trial, 4/15/2008, Transcript, Docket # 13-9 at 140.)

Evans then called Kembelic G., Nicholas B.'s girlfriend, downstairs. (Docket # 13-8 at 43-44, 91.) One of the three men opened the closet door so that Kembelic G. could see Clea B., Nicholas B., and Rashod H. bound and standing in the closet. (*Id.* at 93.) The three men told her "that it wasn't a game and just to like do what they tell [her] to do." (*Id.* at 94.) Evans and Booker were each holding a handgun (*id.* at 94), and Little Joe then had her lay down on the floor and tied her hands and ankles with duct tape (*id.* at 93-94). They then put Kembelic G. in the closet with Clea B., Nicholas B., and Rashod H. (*Id.* at 95.) Kembelic G. testified that she was tied up and held against her will (*id.* at 89) and that she did not want to be put in the closet (*id.* at 95). When asked if she believed they were free to leave, Kembelic G. said no. (*Id.* at 95.)

- 3 -

Once Kembelic G. was placed in the closet, Evans called Nathan B. and the three youngest children—Milan S. (Age 10), Jaden S. (Age 8), and Quaran "Corey" S. (Age 11)—downstairs. (*Id.* at 46, 95-96; Docket # 13-9 at 160-61.) Milan, his brother, Quaran, and his sister, Jaden, were told to sit on the couch. (Docket # 13-9 at 139, 162.) Evans and Booker each had a gun (*id.* at 163) and showed Milan, Quaran, and Jaden the four others—Clea B., Nicholas B., Rashod H., and Kembelic G.—who were tied up in the closet (Docket # 13-8 at 115; Docket # 13-9 at 140, 163). Quaran S. testified that Clea B., Nicholas B., Rashod H., and Kembelic G. were all "squished up" in the closet; Clea B. was trying to not urinate; and Nicholas B. was crying. (*Id.* at 140.) Initially, the three youngest children thought it was a game, but Evans told them that he was serious and threatened to shoot them if they tried to run. (Docket # 13-8 at 48, 96; Docket # 13-9 at 142.) Evans and Little Joe were each holding a gun. (Docket # 13-9 at 117.) Evans then tied Quaran's hands and feet with a shirt and belt; he used a rope to secure Nathan's hands; and he placed a scarf over Jaden S.'s eyes. (Docket # 13-8 at 49; Docket # 13-9 at 117-18.)

Once the seven victims had been secured and bound downstairs, Evans and his co-actors moved all seven of them upstairs. (Docket # 13-8 at 52-53, 97; Docket # 13-9 at 119, 163.) He kept them all in the master bedroom (Docket # 13-9 at 165), waiting for Nicole B. to arrive home to talk to her about Clea B. (*see, e.g.*, *id.* at 104). During this time, Evans turned his attention to Clea B., whom he knew was pregnant (Docket # 13-9 at 178-80): he tried to get Clea B. to drink bleach (Docket # 13-8 at 57; Docket # 13-9 at 145); he pointed a gun at her and threatened to shoot her (Docket # 13-8 at 50); and he also tried on three separate occasions to tie a plastic bag over Clea B's head, and each time she ripped it off (*id.* at 57-59, 98-99; Docket # 13-9 at 120, 144-45, 165-66). Kembelic G. testified that while this was going on, she and the rest of the victims were on the bed

- 4 -

"just waiting" for Nicole B. and Nigel B. to get home. (Docket # 13-8 at 99.) She said that Evans and an accomplice were still holding guns, and she did not believe they were free to leave. (*Id.*) When asked if she thought any of her siblings were enjoying what was going on, Clea B. testified that she did not believe any of her siblings were having fun. (*Id.* at 69.) Milan S. also testified that he wanted to run but felt that he could not because Evans told them that if they ran, he would hurt them. (Docket # 13-9 at 166.)

While the victims were upstairs, Evans gave Little Joe a gun and instructed him to go downstairs and "clean everything off with bleach" and to make sure "that they didn't leave anything behind" downstairs. (Docket # 13-8 at 53-54.) Clea B. testified that Little Joe was gone for about five minutes. (*Id.* at 54-55.) When Little Joe came back up the stairs, the gun he was carrying went off. (*Id.*; *id.* at 96-97.) Evans took back the gun from Little Joe (*id.* at 98) and then gave Little Joe a knife (Docket # 13-9 at 147). The seven victims remained in the upstairs bedroom. (Docket # 13-8 at 55-56.) While upstairs, Evans asked the victims how they wanted to die. (*Id.* at 56.) Evans told them he would shoot them or put them in the tub face first. (*Id.* at 56-57.) Clea B. testified that they stayed in the upstairs bedroom waiting for her mother to get home (*id.* at 60) so that Evans could "make . . . clear" that Clea B. was lying about having sexual intercourse with him (*id.* at 59-60). Kembelic G. testified that Evans told the victims that "this was only happening because of Clea because she was lying about whatever went on between them two." (*Id.* at 104.) At one point before Nicole B. and Nigel B. arrived home, Evans made Nicholas B. take off his shorts. (*Id.* at 60.) Evans said that he planned to shoot Nicholas B. and took him downstairs, but they both came back upstairs a minute or two later. (*Id.*)

- 5 -

A little after 6:00 p.m., Nicole B. and Nigel B. arrived home, about three hours after the incident began. (Docket # 13-8 at 61, 69, 99; Docket # 13-9 at 183.) When Nicole B. arrived home, all the lights in the house were off (Docket # 13-9 at 183) and Evans came to the door wearing gloves (*id.* at 184). She noted that the house smelled like bleach. (*Id.*) Nicole B. went upstairs; Evans followed behind her. (*Id.* at 185.) When she walked into her bedroom, she saw Nicholas B. "tied up lying in the middle of the bed." (*Id.* at 186.) The rest of her kids were also on the bed. (*Id.*) Nicholas B., Clea B., Nathan B., Kembelic G., and Rashod H. were all tied up but the three youngest children, Milan S., Jaden S., and Quaran S., were not. (*Id.* at 186-88.) Kembelic G. testified that Nicole B. looked panicked. (Docket # 13-8 at 101.) Nicole B. asked what was going on, and her son told her it was "because of what [he] told [her] the other day," which she understood to mean that it had to do with Clea B. (Docket # 13-9 at 188-89.) Nicole B. also testified that one of Evans' accomplices showed her a gun. (*Id.* at 189.)

Nicole B. went downstairs with Evans so that they could talk alone and "without anybody having any other input." (*Id.* at 190-91.) She said that the kids were saying and doing things that were "elevating" the situation: they were "saying what they would do if they got their hands loose;" Clea B. was gritting her teeth; Kembelic G. was crying; and Rashod H. was making comments. (*Id.* at 191.) Nicole B. also said that Evans and his accomplices were "talking about getting rid of Clea [B.]" and about how one of the accomplices "didn't like [Nicholas B.]" (*Id.* at 193.) While Evans and Nicole B. were downstairs, the seven victims remained in the bedroom. (*Id.* at 148.) Once downstairs, Nicole B. talked to Evans about Clea B., and Evans told her that he did not want to go to jail. (*Id.* at 191-92).

- 6 -

Nicole B. went back upstairs. (*Id.* at 192-93.) Shortly thereafter, Nigel B. arrived home. (*Id.* at 193.) Evans brought Nigel B. upstairs to the bedroom (*id.* at 194), where Nicole B. was trying to talk the three men "out of doing whatever they were planning on doing" (*id.* at 193). Nicole B. testified that though Evans did not force Nigel B. upstairs, Evans' attitude changed once they got upstairs. (*Id.* at 194.) Evans and his accomplices put a gun to Nigel B.'s back (Docket # 13-8 at 61, 100), pushed him on to the bed (*id.*; Docket # 13-9 at 147, 194), and tied him up with a computer cord (Docket # 13-8 at 61). When Nicole B. asked Booker why he pushed Nigel B., Booker replied that it was because "he didn't like" Nigel B. (Docket # 13-9 at 194.)

Nicole B. and Evans went back downstairs so that she could talk to Evans alone again. (*Id.* at 195.) Clea B. agreed to say that she had lied about having sex with Evans. (*Id.* at 201.) Nicole B. and Evans went back upstairs, at which time Evans and his accomplices discussed whether to let them go. (*Id.* at 200.) Once everyone agreed not to call the police, Evans told his accomplices to untie everyone and let them go. (*Id.* 200-01.)

Detective Michael Caballero testified that law enforcement officers recovered a backpack at Evans' uncle's house in December of 2007. (Docket # 13-8 at 7-8.) Inside the backpack, Detective Caballero found duct tape, latex gloves, and marijuana. (*Id.* at 8-9.) At trial, Clea B. identified the backpack as the one Evans brought to the house. (*Id.* at 30.) Detective James Andritsos testified that he, along with other law enforcement officers, observed a bullet hole in the eighth stair of the victims' house. (Docket # 13-9 at 217.)

Evans testified that Little Joe and Booker were responsible for what happened and that the only reason he stayed was to keep the children from getting killed. (Jury Trial Transcript, 4/16/2008, Docket # 13-10 at 40, 41, 45.) He testified that he never had a gun but did have a knife and that he

- 7 -

never touched anyone during the incident. (*Id.* at 39, 45, 51.) Evans further testified that it was when he was first confronting Clea B. that Booker pulled out a gun and told everyone to lay down on the floor. (*Id.* at 37-38.) He said that Booker "cocked the pistol and put it to the back of [Clea B.'s] head" and threatened to "kill the whole house." (*Id.* at 39.) Evans testified that he told Booker to wait for Nicole B. to get home and that he would get them to agree to not call the police. (*Id.*) He further testified that Booker then put everyone in the closet. (*Id.*)

Evans testified that Nicole B. and Nigel B. arrived home during the course of the evening. (*Id.* at 40-41.) He further testified that he talked with Nicole B. alone and told her that he wanted Clea B. to "tell the truth," because Clea B.'s allegations would result in him going to jail. (*Id.* at 42-43.) When asked whether a gun had gone off during the time he was there, Evans testified that a gun went off accidentally when Nigel B. pulled a gun and Evans smacked it away from him. (*Id.* at 42.)

Evans testified that Booker grabbed Nicholas B. and put a gun to his head when everyone was upstairs in Nicole B.'s bedroom. (*Id.* at 46.) He further testified that he put his hand between Nicholas B. and the pistol. (*Id.*) Evans said that he then told everyone to untie themselves and that everyone was able to get "out of the tape." (*Id.* at 48.) He further testified that he, Booker, and Little Joe left with Nicholas B., Rashod H., and Nigel B. to drop Booker and Little Joe at Evans' uncle's house. (*Id.* at 49.) He then returned to the house after picking up some pizza and buying some marijuana. (*Id.*) Evans further testified that he stayed the night at the house and the next day went out to buy everyone chicken. (*Id.* at 49-50.) He testified that he apologized but that "[t]hings [were] cool at the house." (*Id.* at 51.)

- 8 -

As noted earlier, Evans was convicted of all nine counts of false imprisonment. (Docket # 13-2 at 12; Docket # 13-11 at 4-8.) Evans was sentenced to 21 years of initial confinement and nine years of extended supervision. The individual sentences are broken down as follows:

> On Count 3, Evans was sentenced to eight years of initial confinement and three years of extended supervision; he received the same sentences, concurrent to Count 3, on Counts 4 and 5. On Counts, 6, 8, 9, and 10, Evan was sentenced to eight years of initial confinement followed by three years of extended supervision, which were to run concurrent to each other but consecutive to the sentences on Counts 3, 4, and 5. On Count 11, Evan was sentenced to five years of initial confinement and three years of extended supervision, which was to be consecutive to all other sentences.

(*See* Docket # 13-2 at 8-9.)

Following his conviction and sentencing, Evans filed an appeal with the Wisconsin Court of Appeals (2009AP889). (Docket #13-4.) Evans alleged that there was insufficient evidence to convict him of four of the nine counts of false imprisonment because the corresponding victims did not testify at his trial. This, he alleged, prevented the State from being able to produce evidence to show that the victims of those four counts did not consent to being restrained. After a lengthy discussion of the facts adduced at trial, and explaining that circumstantial evidence may provide the basis for showing a lack of consent, the Court of Appeals upheld Evans' convictions. Evans then petitioned to the Wisconsin Supreme Court, which denied his petition for review. (S. Ct. Pet. for Review, Docket # 13-5; S. Ct. Order Denying Pet., Docket #13-6.) On July 20, 2011, Evans filed the instant petition for a writ of habeas corpus. (Docket # 1.)

## STANDARD OF REVIEW

The habeas corpus statute was amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104-132, 100 Stat. 1214, which provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings

- 9 -

> unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This provision entitles federal courts acting within their jurisdiction to interpret the law independently, but requires them to refrain from "fine tuning" state court interpretations. *Lindh v. Murphy*, 96 F.3d 856, 870-77 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). "Thus, although this court reviews the state court's legal conclusions and mixed questions of law and fact de novo, that review is 'tempered by AEDPA's deferential constraints.'" *Hereford v. McCaughtry*, 101 F. Supp. 2d 742, 746 (E.D. Wis. 2000) (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 120 S.Ct. 1495, 1519 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court

- 10 -

'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 120 S.Ct. at 1523).

For an application of federal law to be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565-66 (7th Cir. 2000) (quoting *Williams*, 120 S.Ct. at 1522), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

Similarly, for a state court's determination of fact to be unreasonable under 28 U.S.C. § 2254(d)(2), the habeas court must more than "merely" determine it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010) (internal citations omitted). That is, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's . . . determination.'" *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 341-42 (2000)).

## ANALYSIS

*1. Preliminary Matters*

Before addressing the merits of this case, the Court must address two preliminary matters. First, although the petitioner grounds his petition on a sufficiency of the evidence challenge, portions of his brief seem to also raise a confrontation clause claim. (*See* Docket # 16 at 6, 7, 8.) To the extent Evans is raising a confrontation clause challenge, this Court will not consider it. In order for a petitioner to raise an issue in a habeas petition, he must fully exhaust all the remedies available to him in State court. 28 U.S.C. § 2254(b)(1)(A); *Mallone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008). Evans did not present a confrontation clause challenge to the state courts. (*See* Docket # 13-2, 13-3, 13-4, and 13-5.) A petitioner who fails to properly assert his federal claim at each level of state court procedurally defaults that claim. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). In order for the claim to be entertained on habeas review, he must establish cause for and prejudice stemming from that default or establish that the denial of relief will result in a miscarriage of justice. *Id.* Evans has made no such argument in his brief. Therefore, this Court will not consider Evans' confrontation clause challenge.

Second, in opposition to Evans' petition, the respondent argues that the Court should dispose of Evans' claims under the concurrent sentence doctrine. The concurrent sentence doctrine permits a habeas court to exercise its discretion in deciding whether or not to consider a petitioner's claims that will not affect the petitioner's custody. *Steffes v. Pollard*, 663 F.3d 276, 280 (7th Cir. 2011); *Cramer v. Fahner*, 683 F.2d 1376, 1380-81 (7th Cir. 1982). The respondent asserts that because Evans is challenging three convictions with sentences that are concurrent to the other sentences which he does not challenge, this Court need not address Evans' challenges to those three convictions. The Court

- 12 -

declines this invitation. Because whether to employ the concurrent sentence doctrine is discretionary, *see Steffes*, 663 F.3d at 280, and because Evans challenges each of his convictions on the same basis, this Court finds it unnecessary to exclude the three challenged convictions for which Evans is serving a concurrent sentence.

### 2. *Sufficiency of the Evidence*

Turning to the merits, Evans challenges the sufficiency of the evidence on four of the false imprisonment counts involving Nicholas B. (Count 4), Rashad H. (Count 5), Nathan B. (Count 10), and Nigel B. (Count 11). Specifically, Evans argues that the State failed to prove lack of consent on those four false imprisonment counts because those victims did not testify.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When insufficiency of evidence is asserted as the basis for a habeas petition, the petitioner must show "'upon the record evidence adduced at the trial no rational trier fact could have found proof beyond a reasonable doubt.'" *Cabrera v Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 324 (1979)). The inquiry does not require the federal habeas court to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *See Jackson*, 443 U.S. at 324 n.

16. Under Wisconsin law, a defendant is guilty of false imprisonment if he "intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so." Wis. Stat. § 940.30. "Without the person's consent" is not defined in the statute. *See id.*; *State v. Long* 2009 WI 36, ¶ 31, 317 Wis. 2d 92, 107, 765 N.W.2d 557, 565. However, under Wisconsin law, consent in the context of false imprisonment "is established by words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to be confined or restrained." *Long*, 2009 WI 36, ¶ 32, 317 Wis. 2d at 107-08, 765 N.W.2d at 565. For the State to show a lack of consent, it need not prove that a victim resisted or said no; rather, it must prove the absence of freely given agreement. *See id.* Moreover, under Wisconsin law, consent, or lack of consent, may be established by circumstantial evidence. *See State v. Champlain*, 2008 WI App 5, ¶¶ 37-38, 307 Wis. 2d 232, 254, 744 N.W.2d 889, 899-900 (explaining that "owner nonconsent [in the context of a burglary], like other elements of criminal offenses, may be proved by circumstantial evidence.")

In considering Evans' insufficiency of evidence argument, the Wisconsin Court of Appeals used a standard consistent with *Jackson*. (*See* Docket # 13-4.) Citing to *State v. Long*, the Wisconsin Court of Appeals stated:

> When a defendant challenges a verdict based on sufficiency of the evidence, we give deference to the jury's determination and view the evidence in the light most favorable to the state. If more than one inference can be drawn from the evidence, we must adopt the inference that supports the conviction. We will not substitute our own judgment for that of the jury unless the evidence is so lacking in probative value and force that no reasonable jury could have concluded, beyond a reasonable doubt, that the defendant was guilty.

(*Id.* at 6-7 (internal citations omitted)). Evans correctly does not challenge the standard used by the Wisconsin Court of Appeals.

- 14 -

Consequently, this Court turns to whether the Wisconsin Court of Appeals misapplied *Jackson* or made an unreasonable determination of the facts. In assessing whether no reasonable jury could have found that the State proved a lack of consent on the part of the four witnesses who did not testify, the Court of Appeals thoroughly summarized the testimony:

> According to Clea B., she, Nicholas B. and Rashod H. were alone in a room when Evan, Brown and Roschyk entered the room with a book bag and shut the door. Clea B. testified that Evans ordered Nicholas B. and Rashod H. to lie on the floor and told Roschyk to "tie them up." She testified that both Evans and Brown had guns, that Roschyk bound their ankles and hands behind their backs with duct tape, and that all three men were wearing latex gloves. Clea B. testified that during this encounter, Evans told her that she should not have lied to her family about having sexual relations with him in September 2007. She testified that she, Nicholas B. and Rashod H. were then put in a closet. At that point, Kembelic G. entered the room and was duct taped in the same manner and was also placed in the closet.

> Clea B. testified that after she, Nicholas B., Rashod H., and Kembelic G. were placed in the closet, Evans called for Nathan B., Jaden S., Milan S., and Quaran S. Clea B. testified that Evans had shut the closet door, but that she heard him tell her siblings that "it was all my fault" and that Evans then opened the closet door. She testified that Evans also said that "if they try to run, he was gonna shoot them, just be cooperative and everything's gonna work out." She testified that Quaran S. was tied up with a shirt and belt, Nathan B. was bound with a rope, and a scarf was tied around Jaden S.'s eyes. She also testified that Evans "put [a] gun in my face and said he should kill me."

> According to Clea B., all nine [sic] of the victims were eventually moved upstairs to Nicole B.'s bedroom. Clea B. testified that after they were moved upstairs, Evans told Roschyk to "go downstairs and clean everything off with bleach . . . make sure there's no type of hair and stuff like that." She testified that Evans "kept asking us how we wanted to die . . . He was telling us how he was going to kill us . . . He told us he was going to take us downstairs either one by one and shoot us or put us in the tub face first." She also testified that Evans twice covered her head with plastic bags and tightened them in the back. She testified at one point, Evans made Nicholas B. take off his shorts and took him downstairs and told Nicholas B. that he was going to shoot him.

> Clea B. testified that eventually, Nicole B. and Nigel B. came home and that Nigel B. entered the room with a gun held to his back and his hands in the air, and that Nigel B. was bound with a computer cord. She testified that Nicole B. and Evans went downstairs for approximately thirty minutes before returning upstairs where Evans told Brown and Roschyk to let everyone go.

- 15 -

> Nicole B. testified that when she arrived home, Evans opened the door and when she turned to go into her room, she observed Rashod H., Kemeblic G., Clea B., Nathan B., and Nichola B. "on the bed tied up," and that Jaden S., Milan S., and Quaran S. were not tied up at that time. She testified that Nigel B., Nicole B.'s other son, arrived home some time later. She testified that after Nigel B. came upstairs, "[Evans] told Brown to tie him up; and then Brown pushed him on the bed. And I asked him why did he push him, and he said he didn't like him." Nicole B. testified that she and Evans went downstairs alone to talk. According to Nicole B., after Evans spoke with her, everyone upstairs was untied and free to go, and the victims agreed not to call the police. Testimony substantially similar to that given by Clea B. and Nicole B. regarding the events that transpired on November 23, 2007, was also received from Kembelic G., Jaden S., Quaran S., and Milan S.

(Docket # 13-4 at 3-5.)

The Wisconsin Court of Appeals then concluded that the evidence would allow a jury to find, by circumstantial evidence, that none of the four non-testifying victims gave Evans consent to imprison them. Upon examining the trial record, this Court agrees. Based on the evidence in the record, this Court cannot conclude that no rational juror could find beyond a reasonable doubt a lack of consent on the part of the four witnesses who did not testify. As to Nicholas B. (Count 4), the evidence at trial was that he was forced to lie down on the floor. (Docket # 13-8 at 26, 28.) His hands and ankles were then duct taped behind his back. (*Id.* at 32.) He was then placed in a closet with Clea B. and Rashod H. (*Id.*) Additionally, at one point, Nicholas was made to take off his shorts and go downstairs while Evans threatened to shoot him. (*Id.* at 60.)

As to Rashod H., (Count 5), the evidence adduced at trial was that he, too was made to lie face down on the floor and have his ankles and wrists duct taped. (*Id.* at 26, 28, 32.) As indicated above, he was also placed in the closet. (*Id.* at 32.) As to the final two non-testifying victims, a rope was used to secure Nathan B.'s (Count 10) hands behind his back. (*Id.* at 49.) Finally, Nigel B. (Count 11), who was the last to arrive, had a gun placed in his back (*id.* at 61, 100), was pushed onto the bed (*id.*; Docket # 13-9 at 147, 194), and was tied up (Docket # 13-8 at 61).

Clea B. testified that these witnesses did not seem to be enjoying the experience. (*Id.* at 69.) Kimbelic G. testified when she observed Nicholas B. and Rashod H. in the closet they were not laughing. (*Id.* at 95.) Quaran S. testified that he observed Nicholas and the others were "squished up" in the closet and that Nicholas B. was crying. (Docket # 13-9 at 140.) On this record, the jury had a reasonable basis to conclude that these four witnesses did not consent to the restraint.

Evans argues that this evidence merely showed that the victims were restrained but does not prove consent, which is a separate element. In particular, Evans argues that the four witnesses should have been called and explicitly asked if they consented to being restrained. The Court agrees with Evans that consent is a separate element of false imprisonment. However, Evans' argument misses an important point. Under Wisconsin law consent may be proven by circumstantial evidence. As stated earlier, for the State to show a lack of consent, it need not prove that a victim resisted or said no; rather, it must prove the absence of freely given agreement. *See Long*, 2009 WI 36, ¶ 31, 317 Wis. 2d at 107, 765 N.W.2d at 565. Use of circumstantial evidence rather than direct evidence does not contravene federal law. *See, e.g.*, *Holland v. United States*, 348 U.S. 121, 139-40 (1954) (holding that circumstantial evidence that convinces a jury beyond a reasonable doubt is sufficient to sustain a conviction and explaining that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence."). The test is not the type of evidence—direct or circumstantial—but whether reasonable inferences can be drawn to support a conviction when the evidence is considered in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319 (internal citation omitted). Here, the testimony described above was sufficient for a rational jury to find that the State had circumstantially proven lack of consent.

In his reply, Evans makes the additional argument that because much of the evidence discussed above came from Clea B. and Nicole B, it should be discredited. In other words, Evans contends that if Clea B. and Nicole B. were not believed as to the sexual assault counts for which he was acquitted, how can they be believed on the false imprisonment counts? But it is well established that the finder of fact, in this case the jury, can accept witnesses' testimony in whole or in part. *See* Wisconsin JI-Criminal 300 (explaining to jurors that they are "the sole judges of the credibility, that is, believability, of the witnesses and of the weight to be given to their testimony."); *State v. Paeglow*, 56 Wis. 2d 815, 821-22, 202 N.W.2d 916, 918-19 (Wis. 1973) (explaining that "when the witness' testimony is contradictory the . . . jury, as the trier of fact, can believe and accept only such parts thereof as it finds to be most credible."); *State v. Toy*, 125 Wis. 2d 216, 222, 371 N.W.2d 386, 389 (Wis. Ct. App. 1985) (explaining that "[i]t is certainly allowable for the jury to believe some of the testimony of one witness and some of the testimony of another witness even though their testimony, read as whole, may be inconsistent."); *United States v. Colston*, 936 F.2d 312, 315 (7th Cir. 1991) (stating, "[g]enerally, juries may rejects parts of a witness's testimony while accepting other parts.") (internal citation omitted). Thus, Evans' jury was free to accept the testimonies as to the false imprisonment counts and reject them as to the sexual assault counts. Accordingly, this split verdict is not a basis for this Court to conclude that no reasonable jury could find that the State had proven lack of consent.

At any rate, as the Wisconsin Court of Appeals noted, other evidence adduced at trial also supported the jury's finding that none of the four non-testifying victims consented to being imprisoned: Kembelic G. testified that no one in the closet—Nicholas B., Clea B, Rashod H., and herself—was laughing (Docket # 13-8 at 93-94); according to Kembelic G., Jaden S., and Quaran

- 18 -

Case 2:11-cv-00690-NJ   Filed 02/11/13   Page 18 of 20   Document 24

S., Evans remained in possession of a firearm (*id.* at 94, 96, 100; Docket # 13-9 at 117, 119, 143, 151, 163); and overall, the testimony "described a dangerous and threatening situation in which the defendant bound or ordered bound the victims while holding a gun and threatened to kill the victims while they were restrained" (Docket # 13-4, 7-8).

"Challenging the sufficiency of the evidence is a tough undertaking at best." *United States v. Holstein*, 618 F.3d 610, 612 (7th Cir. 2010) (internal citation omitted). Evans has failed to meet his burden. Based on the foregoing, the Wisconsin Court of Appeals decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, the petition is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n. 4). In this case, reasonable jurists would not find the court's decision to deny the petition on substantive grounds debatable or wrong. Thus, the court will deny a certificate of appealability as to Evans' claim.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **denied**.

**IT IS FURTHER ORDERED** that this action be and hereby is **dismissed**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of February, 2013

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge